**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NICHOLAS OLIVAS,         )   NO. EDCV 10-1637 SS
                        )
          Plaintiff,   )
                        )
         v.           )  **MEMORANDUM DECISION AND ORDER**
                        )
MICHAEL J. ASTRUE,        )
Commissioner of the Social   )
Security Administration,    )
                        )
         Defendant.   )
_____)

**I.**

**INTRODUCTION**

Nicholas Olivas ("Plaintiff") brings this action seeking to reverse the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying his application for Supplemental Security Income ("SSI"). The parties consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the decision of the Commissioner is AFFIRMED.

\\

## II.

## PROCEDURAL HISTORY

Plaintiff applied for Title XVI SSI benefits on November 6, 2007,[1] alleging a disability onset of January 1, 2001. (Administrative Record ("AR") 9; see AR 86-88). Plaintiff claimed he is disabled due to past head trauma that caused difficulties in understanding, balance, equilibrium, memory, dizziness, dry mouth, lack of coordination and frequent headaches. (AR 96). Plaintiff also noted that he feels weak and faints if he exerts himself for twenty minutes, that he experiences slurred speech and is unable to function normally due to his medications. (Id.). Plaintiff alleges that he was diagnosed as schizophrenic and bipolar, that he suffers from hallucinations, hears voices, experiences extreme paranoia, and is depressed. (Id.).

The Agency initially denied Plaintiff's SSI claim on May 5, 2008. (AR 49-54). Plaintiff requested reconsideration on May 20, 2008. (AR 57). The Agency denied his claim again on December 24, 2008. (AR 59-63). Thereafter, Plaintiff filed a Request For Hearing By Administrative Law Judge on January 29, 2009. (AR 64).

The Agency scheduled a hearing for June 30, 2009. Plaintiff testified at the hearing before Administrative Law Judge ("ALJ") Jay E. Levine, in San Bernardino, California. (AR 19-44). Sandra Fioretti, a vocational expert also testified at the hearing. (Id.). Denise

---

[1] Plaintiff also concurrently filed for Title II Social Security Disability Insurance benefits, but later withdrew his Title II application at the June 30, 2009 hearing. (AR 21-22).

Valsquez, Plaintiff's sister also appeared, but did not testify at the hearing. (Id.). The ALJ denied Plaintiff's claim on November 18, 2009. (AR 6-14). On January 14, 2010, Plaintiff sought review of the ALJ's unfavorable decision before the Appeals Council. (AR 5). On September 15, 2010, the Agency denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (AR 1-3). Plaintiff commenced this action on October 26, 2010.

### III.

### FACTUAL BACKGROUND

Plaintiff was born on June 11, 1964 and was forty-five years old at the time of the hearing. (AR 22-23, 86). Plaintiff received his GED in 1992. (AR 101). Plaintiff has past work experience as a furniture mover, (AR 97, 129, 204), as a porter while in prison, (AR 130, 204), and as a self-employed handyman. (AR 131, 204). Plaintiff claims disability stemming from schizophrenia, bipolar disorder, and trauma from a head injury in 2002. (AR 96).

**A.   Plaintiff's Records**

Plaintiff noted that he has spent "most of [his] life in prison." (AR 135). Plaintiff testified at the June 30, 2009 hearing that he was incarcerated from 1989 to 1992 for "possession and sale of cocaine," and was incarcerated again in 2002 for sixteen months for "receiving stolen property." (AR 26). In 2002, Plaintiff was found guilty of purchasing and receiving a stolen 1991 Honda, and attaching a stolen license plate to the car. (AR 227). After serving the sentence for his 2002

conviction, Plaintiff was released on parole. (See AR 26). Plaintiff testified that after his 2003 release, he violated his parole "like four . . . or five" times by absconding, and was incarcerated for approximately six months or less after each violation. (AR 27).

A substantial portion of the record is comprised of Case Management Notes from the California Department of Corrections ("CDC") regarding Plaintiff's behavior and progress while out on parole. (See AR 219-250, 277-299). The CDC Case Management Notes include evaluations that detail, inter alia, Plaintiff's commitment offense and criminal history reports. (AR 227). Evaluations reflect that on May 19, 2004, June 6, 2006, June 26, 2007, and July 23, 2007, Plaintiff violated parole by absconding, and "not reporting to his agent." (AR 227, 233, 245, 296). These evaluations also note Plaintiff violated his parole by having "access to ammo and a knife." (Id.). Specifically, all evaluations claim Plaintiff's past criminal history:

> [I]s violent and includes the use of narcotics. [Plaintiff] was arrested July of '99 for Spousal Battery. [Plaintiff] in fact has been arrested numerous times on Spousal Battery. [Plaintiff] stated that he committed [ten] [b]atteries on just one of his girlfriends. [Plaintiff] has also been either charged or arrested for Possession of a Controlled Substance, Fighting, Resisting Arrest, Forgery.

(Id.). In addition to Plaintiff's parole violations for absconding, Plaintiff has also violated parole on two separate occasions by abusing methamphetamine on June 26, 2006, and August 14, 2006. (AR 252).

4

In total, Plaintiff has "served four prison terms, spent a total of eleven years incarcerated, and was last paroled in June 2008." (AR 386). Plaintiff was eventually discharged from parole in September 2008. (AR 306).

**B.  Substance Abuse History**

During Plaintiff's June 30, 2009 hearing, Plaintiff testified that he had used methamphetamine, marijuana, and cocaine in the past, but had not used any drugs for about two years prior to the hearing. (AR 25). Plaintiff testified that he participated in a program for six or seven months to "straighten out." (AR 25-26).

The CDC Case Management Notes provide further detail regarding Plaintiff's substance abuse history. The May 19, 2004 evaluation states that Plaintiff reported "both marijuana and methamphetamine would relax him especially when he was upset and he used them both mellow out," and that Plaintiff said "back in 1992 he was really into methamphetamine . . . that he was cooking methamphetamine in a house in Covina when it blew up. The explosion of course brought the police." (AR 229).

The June 6, 2006 evaluation states that at the time of the report, Plaintiff claimed that he used methamphetamine and marijuana regularly to "mellow out." (AR 235). The July 23, 2007 evaluation reports that Plaintiff "stated he has tried every drug out there beginning as a [sic] early teen and into adulthood. [Plaintiff] told me he was reluctant to talk about this because is [sic] he thinks it might hinder his social security claim." (AR 297). The evaluation further states, "[Plaintiff]

5

has used cocaine, meth, and marijuana . . . [and] used it when ever [sic] it was around, which sounded like allot [sic].  [Plaintiff] was adamant that he is not an addict.  Clinically [Plaintiff] was minimizing his pattern of use and was reluctant to disclose too much."  (AR 297-98).

Plaintiff's methamphetamine abuse resulted in parole violations on June 26, 2006 and August 14, 2006, as reported by Plaintiff's parole agent, C. Reed-Johnson, in his February 4, 2008 Parole Agent Questionnaire.  (AR 252-53).  In that same questionnaire, Mr. Reed-Johnson further reported that as of the date of the questionnaire, Plaintiff received monthly scheduled and random drug tests as part of his parole.  Mr. Reed-Johnson also reported that Plaintiff has not tested positive since his "last release" on May 24, 2007.  (AR 252).

**C.   Plaintiff's Medical History**

**1.   Treating Physicians**

On the June 18, 2009 "Claimant's Recent Medical Treatment" form, Plaintiff identified his current treating physicians as High Desert Walk-In Crisis Center's ("HDCWIC") Dr. Bagwal, and the Arrowhead Regional Medical Center ("Arrowhead") staff.  (AR 201).  Plaintiff stated that he has been a patient of Arrowhead since September 2008 and HDCWIC since January 2009.  Plaintiff reported that treating doctors informed him that he has "major problems with balance, . . . suffer[s] from depression, bi polar [sic], schizophrenia, rage[] hallucinations, hear[s] voices, [commits] self-mutilation," observes that he breaks out

in sweats, notes that he sustained a head injury, "can't see well, . . . ha[s] been suicidal," and that he is confused and unstable. (Id.). In addition, Plaintiff met regularly with CDC doctors during his parole for medication monitoring. (AR 219-50, 270-99).

On the June 18, 2009 Claimant's Medications form, Plaintiff reported that he was presently taking Seroquil 400mg twice daily and Depacote 500mg three times daily as an anti-psychotic medication, a mood stabilizer, and as treatment for his bipolar disorder. (AR 203). Plaintiff also noted that was taking Celexa 20mg twice daily and Propranolol 20mg three times daily for depression and hypertension, respectively; Benadryl 50mg three times daily to help with the medication interaction of his other prescriptions; and Effexor 75mg twice daily for depression. (Id.). Plaintiff reported that he had been taking Seroquil and Depacote since 2002, Celexa and Effexor since November 2008, Benadryl since February 2009, and Propranolol since March 2009. (Id.). Plaintiff stated that he suffered from hallucinations as a side effect of the Propranolol. (Id.).

a.   Arrowhead Regional Medical Center

The records provided by Arrowhead primarily consist of pre-printed handouts that contain information identifying Plaintff's prescribed drugs. The handouts explain the drug's common uses, what Plaintiff should do before taking the medication, how Plaintiff should take the medication, what Plaintiff should do in the event of an overdose, and other information. (AR 208-09, 312-27, 338, 343-47). These informational handouts reflect that Arrowhead prescribed to Plaintiff

Seroquel, Depakote, Diphenhydram (an antihistamine), Propranolol, Effexor, Temazepam (used to treat sleep disorders), Citalopram (used to treat depression), Divalproex (used to treat seizures) and Famotidine (a histamine blocker used to treat ulcers).  (Id.).

In addition to these prescription informational handouts, the Arrowhead records contain three Notices of Certification, dated December 29, 2007, February 13, 2009 and February 20, 2009, respectively.  (AR 210, 340, 341).  These notices certified Plaintiff as eligible to "receive intensive treatment for no more than [fourteen] days" in Arrowhead's Behavioral Health intensive treatment facility for being a danger to himself and being "gravely disabled." (Id.).  Of the three notices in the record, only the February 20, 2009 notice is legible. It states that the staff at Arrowhead certified Plaintiff for commitment because he was "very depressed . . . [brother with] life sentence mom dying of [cancer], has suicidal thought [sic], unable to work . . . no plan to self care."  (AR 340).  The proposed treatment plan for the committal was for "medication stabilization and or possible placement." (Id.).

The Arrowhead records also contain an Involuntary Patient Advisement ("Advisement"), dated February 18, 2009, that informed Plaintiff that he would "be held for a period of up to [seventy-two] hours" beginning February 17, 2009 at 9:30PM and ending at February 20, 2009 at 9:30PM.  (AR 342).  The Advisement indicated the seventy-hour committal was necessary because it was the opinion of the professional staff at Arrowhead that Plaintiff was likely to harm himself because he was "hearing voices telling [him] to harm [himself] with plan [sic] to

8

run into traffic" and because there was a "history of previous suicide attempts."   (Id.).

        b.   High Desert Crisis Walk-In Center

HDCWIC records contain a Psychiatrist Intake Assessment Form, dated January 14, 2009; four Crisis Stabilization Follow Up of Care Forms, dated January 25, 2009, February 6, 2009, February 9, 2009 and April 23, 2009, respectively; a Psychiatric Evaluation Follow Up of Care Form, dated May 26, 2009; and a MD Progress Note from Dr. Adam Opbroek, dated February 6, 2009.  (AR 358-364).  The record also contains a Medication Refill: Psychiatrist's Assessment, dated October 24, 2007.  (AR 391).

In the January 14, 2009 Intake Form, Dr. Opbroek noted Plaintiff complained of auditory hallucinations, paranoia, anger and that he demanded Ativan.  (AR 364).  Dr. Opbroek stated, "[Plaintiff] [d]enies [suicidal ideations/homicidal ideations] and is clearly capable of creating much risk for himself or others."  (Id.).  Dr. Opbroek described Plaintiff as an "antisocial character" with a "potential for explosive assaultive behavior," who was "last on meds several months ago."  (Id.).  Although Plaintiff denied drug abuse, Dr. Opbroek suspected he was still abusing.  (Id.).  Dr. Opbroek also noted Plaintiff's sensorium, orientation, eye contact and speech were "normal," his motor skills were "restless," his thought content was paranoid, his thought process was "circumstantial," and his insight, judgment, and impulse control was "decreased."  (Id.).  Dr. Opbroek prescribed Plaintiff Zyprexa on a trial basis to "clarify [treatment] need and [diagnosis] while diminishing risk."  (Id.).

In the January 25, 2009 Crisis Stabilization form, Dr. Opbroek reported that Plaintiff came in complaining that the Zyprexa was not working, and complained about "anger, impulse control, aggression." (AR 363). Dr. Opbroek observed that Plaintiff's sensorium, orientation, eye contact, speech, mood, and thought content were "normal," his motor was "restless," his mood was "angry," his affect was "reactive," his thought process was "circumstantial," and his insight and judgment were "impaired." (Id.). Dr. Opbroek also noted that Plaintiff did have some suicidal ideations, but with no plan or intent to execute them. (Id.).

The February 6, 2009 and February 9, 2009 Crisis Stabilization notes show that Plaintiff was not on any medication at the time of the appointment. (AR 360-61). Although the notes reflect Plaintiff had no suicidal or homicidal ideations and was "normal" in the areas of his senses, orientation, eye contact, motor, speech, thought process, insight and judgment, Plaintiff was "labile," "hypomanic," and suffered from "hallucinations, delusions, paranoia and depression." (Id.).

In the February 6, 2009 MD Progress Note, Dr. Opbroek reported Plaintiff was brought to HDCWIC after he called 911 threatening to commit suicide, and after the sheriff determined there was no acute need for a "5150 committal." (AR 362). Dr. Opbroek stated, "[Plaintiff] claims none of his meds are working, resists filling out paperwork or interactions with staff, and states he 'wants to go voluntarily' to the hospital. This presentation [is] identical to prior [HDCWIC] visits and he has also been seeking Benzo [prescription] without success." (Id.). Dr. Opbroek noted that Plaintiff sat calmly in the clinic, exhibited "no mania, mood instability, recurring active signs of depression, or

psychotic thought processes.  His anger, irritability, and threat of killing himself only [were] verbalized when he [was] advised [his] clinical condition does not warrant 5150, and that he exhibits no indication for acute hospitalization." (Id.).  Dr. Opbroek ultimately concluded Plaintiff's "presentation [was] clearly consistent with malingering." (Id.).

The April 23, 2009 Crisis Stabilization reflects that Plaintiff was back on his medication, and that he felt "somewhat stable" as a result. (AR 359).  Plaintiff was still "hypomanic," "labile, and suffering from hallucinations, delusions and paranoia." (Id.).  Further, the May 26, 2009 Psychiatric Evaluation notes indicate Plaintiff reported that he was "doing well" after going back on his medication.  (AR 358).

HDCWIC records also indicate Plaintiff received prescriptions for Propranolol, (AR 368), Diphenhydramine (used to treat symptoms of the common cold and allergic conditions), (AR 371), Venlafaxine and Citalopram (both used to treat depression), (AR 372-73), Seroquel, (AR 377) and Divalproex Sodium (used to treat seizures, bipolar disorder, and migraine headaches).  (AR 378).

        c.   CDC Case Management Notes

The CDC Case Management Notes include sections on Plaintiff's Medical History, Mental Status Examination, Psychiatric History, Relevant Psychosocial Information, Treatment Plans, and notes on medication monitoring appointments between Plaintiff and the CDC treating physician. (AR 219-250, 270-99).

According to notes prepared on May 20, 2004 from Plaintiff's medication monitoring appointment with Dr. Ronald Marcus, Plaintiff was initially referred for a medication evaluation because he was on psychotropic drugs while incarcerated. (AR 221). During the appointment, Plaintiff stated he has "always had a problem" with mood swings, frequent depression, controlling his anger and has made "several suicide gestures [usually when he broke up with a girlfriend] in the past." (Id.) (internal quotations omitted). Dr. Marcus further reported Plaintiff "was never treated for these symptoms until he was incarcerated" in 2002. (Id.). At this appointment, Plaintiff stated he was "initially treated with Depakote and Seroquel, and he felt the Seroquel was more helpful in controlling his auditory hallucinations . . . but this was discontinued and switched to Geodon when he moved to [the California Institution for Men in Chino, California]." (Id.).

According to the CDC's Medical History Evaluations on May 19, 2004 and June 6, 2006, Plaintiff reported he suffered a head injury in 2002, and claimed, "he was in the garage fighting with his girlfriend's ex-husband when they [sic] girlfriend's ex-husband's son hit him over the head with a wrench. He stated he was knocked unconscious, that a helicopter took him to the hospital, there was a major lost [sic] of blood but that he survive [sic]." (AR 227-28, 234). The CDC's Mental Status Examinations on May 19, 2004, June 6, 2006, and June 26, 2007 concluded that Plaintiff was "well-oriented and alert," was "cognitively intact," and that he "primarily exhibit[ed] symptoms of mood disorder." (AR 228, 234, 295).

During Plaintiff's July 23, 2007 Mental Status Evaluation, the examining physician noted Plaintiff's eye contact "continuously strayed away," and that Plaintiff was "reluctant to offer certain information [because] [h]e felt it would hinder a pending social security claim." (AR 296).   However, the physician noted, Plaintiff's "[c]ognition appear[ed] intact," and that Plaintiff denied suffering from auditory hallucinations and suicidal and homicidal ideations at that time. (Id.).   Plaintiff reported "a long term history of polysubstance abuse and possible dependence."   (Id.).   The physician also noted, "[Plaintiff] exhibits a sense of entitlement to live off his parents and to receive SSI/SSD benefits.   He sees himself as a man better than most and no remorse for his past was expressed."   (AR 296-97).

### 2.   Examining Consultative Doctors

#### a.   Dr. Kevin D. Gregg, M.D.

On March 19, 2008, Dr. Kevin D. Gregg, M.D. examined Plaintiff and prepared his findings in a Psychiatric Review Technique and Mental Residual Functional Capacity (RFC) Assessment.   (AR 254-64, 265-67). Dr. Gregg found Plaintiff suffered from affective and substance addiction disorders.   (AR 254).   Specifically, Dr. Gregg diagnosed Plaintiff with bipolar disorder and multiple substance addiction.   (AR 256-57, 260).   Dr. Gregg found "insufficient evidence to substantiate the presence of" any organic mental disorders, schizophrenic, paranoia, other psychotic disorders, mental retardation, anxiety-related disorders, somatoform disorders, personality disorders, or autistic disorders.   (AR 254-61).

13

1    With respect to Plaintiff's "B" Criteria functional limitations,
2    Dr. Gregg found Plaintiff has mild limitations in activities of daily
3    living, mild difficulties in maintaining concentration, persistence, or
4    pace, moderate difficulties in maintaining social functioning, and no
5    repeated episodes of decompensation. (AR 262). Dr. Gregg also
6    concluded that Plaintiff's impairments also did not meet any "C"
7    criteria. (AR 263).
8
9    Dr. Gregg also opined on Plaintiff's Mental RFC. (See AR 265-267).
10   Dr. Gregg found moderate limitations in Plaintiff's ability to
11   understand and remember detailed instructions, carry out detailed
12   instructions, maintain attention and concentration for extended periods,
13   interact appropriately with the general public, accept instructions and
14   respond appropriately to criticism from supervisors. (AR 265-66). Dr.
15   Gregg also found Plaintiff has no significant limitations in the fifteen
16   other areas of mental functioning. (Id.). Ultimately, Dr. Gregg
17   concluded Plaintiff "is reasonably able to learn, remember and sustain
18   [s]imple, [r]outine [t]asks in a non-public setting over the course of
19   a normal, 40-[hour] work week." (AR 267).
20
21       b.   S&L Medical Group
22
23   On April 15, 2008 and August 17, 2009, the S&L Medical Group
24   conducted a Neurologic Evaluation and Psychological Evaluation on
25   Plaintiff. (AR 270-73, 384-89). Dr. John S. Woodard conducted the
26   Neurologic Evaluation, and Dr. Charlene K. Krieg conducted the
27   Psychological Evaluation. (Id.).
28

1    In the April 15, 2008 Neurologic Evaluation, Dr. Woodard noted
2  Plaintiff was on time for his appointment, was cooperative, and
3  communicated reasonably well.  (AR 270).  During Dr. Woodard's
4  neurologic examination, Plaintiff recounted how he injured his head in
5  2002.  (Id.).  He stated that after he was rendered unconscious, he
6  "regained awareness while he was being transported to the hospital by
7  helicopter."  (Id.).  Dr. Woodard noted Plaintiff's "[f]acial
8  expressions, verbalizations and postures suggest slight emotional
9  tension and emotional overreactivity," and found that Plaintiff's
10  "intellectual function is grossly intact." (AR 271).  Dr. Woodard also
11  found no abnormalities with respect to Plaintiff's motor function,
12  reflex function, sensory function, and cranial nerves.  (AR 271-72).
13  Ultimately, Dr. Woodard concluded that although Plaintiff had an injury
14  to his head, the "examination [did] not reveal any objective neurologic
15  deficits."  (AR 272).  Furthermore, Dr. Woodward found that there did
16  not "appear to be any limitation in [Plaintiff's] physical activities
17  on the basis of his current neurologic status."  (Id.).

19    In the August 17, 2009 Psychological Evaluation, Dr. Krieg reported
20  that Plaintiff "supplied the historical information, and was a fair
21  historian."  (AR 384).  Dr. Krieg noted that "[h]is attitude was one of
22  disinterest in the tasks at hand," and that his "eye contact and
23  interaction with the examiner [was] fair to poor.  He was minimally
24  cooperative and did not appear to be putting forth his best effort on
25  most of the test items."  (AR 384-85).  Dr. Krieg also observed that
26  "[Plaintiff] was able to understand test questions and follow
27  directions.  His psychomotor functions appeared to be within normal
28  limits.  He exhibited fidgeting."  (AR 386-87).  During this evaluation

1   Plaintiff recounted the story of his 2002 head injury, and stated he was

2   unconscious for an unknown period of time, and woke up in the hospital.

3   (AR 385).  Plaintiff denied having any memory of the event.  (Id.).

4

5       During Dr. Krieg's examination, Plaintiff reported that he had been

6   diagnosed with bipolar disorder, mood disorder, depression, and

7   insomnia.  (AR 385).  Further, he "denied any history of hallucinations

8   or homicidal ideations."  (Id.).  Plaintiff also "denied ever drinking

9   alcohol or using drugs," and "denied a history of substance abuse or 12-

10  step meeting attendance."  (Id.).  Dr. Krieg opined:

11

12      [Plaintiff's] current level of intellectual functioning is in

13      the mild mental retarded range.  His performance on

14      attention/concentration tasks that measure simple visual

15      scanning hand sequencing abilities is in the marked to severe

16      deficit range.  His performance on attention/concentration

17      tasks that require the manipulation of complex information is

18      in the low-average to average range.

19

20  (AR 389).  However, Dr. Krieg followed this analysis with the caveat

21  that "[if Plaintiff] was not putting forth his best effort, it is

22  conceivable that his performance could be higher."  (Id.).

23

24      Dr. Krieg ultimately concluded Plaintiff "did not evidence any

25  disorder on mental status."  (AR 388).  Dr. Krieg found Plaintiff's

26  "speech was understandable," and his "TOMM scores were in the very

27  probably range for malingering which raises the question of a conscious

28

or unconscious effort to feign impairment, i.e., fake bad." (AR 388-89).  She further noted that if:

> [H]is test performance is not a valid indicator of his
> current level of functioning, he would be capable of
> understanding clear instructions, following simple
> directions, and completing simple tasks.  He would be able to
> sustain performance on detailed and complex tasks.  He would
> be able to accept instructions from supervisors and interact
> with coworkers and the public.  He would be able to maintain
> a regular attendance in the workplace.  He would not need
> special or additional supervision on work activities.

(AR 389).  Dr. Krieg further concluded:

> [If] his test performance is not a valid indicator of his
> current level of functioning, there is no impairment that
> would interfere with his ability to complete a normal workday
> or workweek.  He would be able to deal with the ususal stress
> that may be encountered in competitive work and adjust to
> changes.  He would not create a hazard in the workplace.  He
> would be capable of performing simple, repetitive work tasks.

(Id.).

\\

\\

\\

\\

**D.   Plaintiff's Work History**

On June 18, 2009 Plaintiff reported on the Claimant's Work Background form that he worked as a furniture mover for Valley Transfer in the San Gabriel Valley from 1987 to 1989, a porter for the Susanville Folson State Prison from 1989 to 1992 and was self-employed as a handyman from 1993 to 2002.  (AR 204).

**E.   Plaintiff's Testimony**

On June 30, 2009, Plaintiff appeared at a hearing before the ALJ. (AR 19).  Plaintiff testified that he suffered a head injury in 2002 when he was "hit seven times with an 18-inch, inch-and-3/4-wrench." (AR 28).  Plaintiff also testified that he "was just a random victim of an attack and somebody had pulled over, they jumped out of the car, they beat [him] they left [him] in the driveway for dead . . . [and that he] woke up three or four days later and had [twenty-two] staples in [his head]."  (AR 28-29).  Plaintiff stated that as a result of his head injury, he has been unable to work.  (AR 29).

Plaintiff noted that he takes Seroquel, Depakote, Propranolol, Celexa, Effexor and Benadryl for his mental impairments.  (AR 29, 31). Plaintiff testified that he is "maxing out" all his medications because his mental condition is worsening.  (Id.).  Specifically, he reported that he is taking 1,200mg of Depakote a day, and Propranolol three times a day.  (AR 29).  As a result, he testified that it is difficult to function under the influence of all his medication.  (Id.).  Plaintiff noted that he has to stop and rest after walking for about seven to ten

18

minutes because he feels like he will pass out.  (Id.).  Plaintiff
stated that he has "to stand up slowly" when he gets up because of the
Seroquel prescription.  (AR 30).  Plaintiff also complained of auditory
hallucinations, depression, dizziness, nausea and a lack of
coordination.  (AR 29, 30, 35).  Plaintiff reported that he cannot exert
himself physically for longer than fifteen or twenty minutes or he will
"blackout."  (AR 31).  Plaintiff stated that he has "tried a lot of,
almost all the other medications [Plaintiff] has tried, and [Plaintiff]
can't function on them."  (AR 30).

Plaintiff explained that he frequently voluntarily discontinues his
medication because he "get[s] frustrated and, and sometimes [Plaintiff]
think[s] that [he] can make it on [his] own." (AR 32).   However,
Plaintiff stated that each time he voluntarily discontinues his
medication, he eventually ends up back on the medications because
Plaintiff "get[s] really out of whack."  (Id.).  Plaintiff noted that,
as of the date of the hearing he had been taking medication as
prescribed for over a year.  (AR 36).

Plaintiff stated at the time of the hearing he was living in an
assisted living shelter.  (AR 28).  Plaintiff testified before living
at the shelter, he lived at another similar shelter for fourteen months,
and before that he was homeless.  (AR 24).  Plaintiff also testified
that he has not lived alone since January 2008. (AR 36).  Plaintiff pays
$600 per month to stay at the shelter, and in return the shelter
provides food and daily reminders to take his medicine.  (AR 28, 34).
Plaintiff testified that he occupies himself by sleeping, "all day, all
day, all day, all day."  (AR 35).  Every once in awhile Plaintiff will

19

walk to a store, however Plaintiff testified that it takes him about "[forty] to [forty-six] minutes" to complete the normally ten minute walk.  (AR 35).

During the hearing, Plaintiff also testified that he had previously used methamphetamine, marijuana and cocaine. (AR 25).  Plaintiff stated he had been "clean" for "about two years" as of the date of the hearing. (Id.).  Plaintiff also testified that he participated in a program "for about six or seven months" to "straighten out." (AR 25-26).  Plaintiff noted that his drug test screens have been negative since May 2007. (AR 37).  Plaintiff further testified that he was incarcerated from 1989 to 1992, and again in 2002 for sixteen months. (AR 26).  In addition, Plaintiff noted that he had spent additional time in prison for violating his parole by absconding.  (Id.).

Plaintiff testified that between the "early '80s to mid '95" he used to work "under-the-table" as a furniture mover.  (AR 33). Plaintiff stated that he used to work for five or six different moving companies all "under-the-table" and all for cash.  (Id.).  Plaintiff typically made ten to twelve dollars per hour for said jobs.  (Id.). Plaintiff testified he discontinued working as a furniture mover because he "can't get along with people and [he] can't work in and around other people because that's just the way that [he is]." (Id.).  Plaintiff further noted that he "branched off and [he] started doing [his] own little construction projects." (Id.).  Plaintiff testified he could not continue this work because of the head injury he suffered in 2002. (Id.).

1  **D.   Vocational Expert's Testimony**

2

3       Sandra Fioretti testified at the June 30, 2009 hearing as a
4  vocational expert ("VE").  (AR 19).  After the VE heard Plaintiff's
5  testimony and reviewed his file, the VE described Plaintiff's past work
6  as a furniture mover who is a "van driver, helper, . . . very heavy,
7  semi-skilled, SVP three . . . ."  (AR 40).  The ALJ then posed two
8  hypothetical questions to the VE.  (Id.).  In the first hypothetical,
9  the ALJ asked the VE whether an "individual of the [Plaintiff's] age,
10 education and prior work experience . . . [with] no exertional
11 limitations . . . [who can work] with things rather than with people and
12 no more than three to four-step work processes" would be able to perform
13 Plaintiff's past work.  (Id.).  Given this hypothetical, the VE found
14 that such a person could.  (Id.).  The second hypothetical was identical
15 to the first, except with the restriction that the person would be "off-
16 task at least [twenty] percent of the time due to psychological based
17 symptoms."  (Id.).  With this added restriction, the VE found that the
18 hypothetical individual would not be able to perform Plaintiff's past
19 work.  (Id.).  Plaintiff's attorney also posed a hypothetical to the VE,
20 asking her if  the same hypothetical individual would be employable if
21 he would miss work more than two days a month due to psychiatric
22 symptoms.  (Id.).  The VE responded that such an individual would not
23 be employable.  (Id.).
24 \\
25 \\
26 \\
27 \\
28 \\

IV.

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. § 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part

---

[2]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. § 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[3] age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-

_____

[3]   Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

1  Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P,
2  Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240
3  F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has
4  both exertional (strength-related) and nonexertional limitations, the
5  Grids are inapplicable and the ALJ must take the testimony of a
6  vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

7

8                                  **V.**

9                         **THE ALJ'S DECISION**

10

11     The ALJ employed the five-step sequential evaluation process and
12  concluded that Plaintiff was not disabled under the Social Security Act.
13  (AR 14).  At the first step, the ALJ found that Plaintiff had not
14  engaged in substantial gainful activity since November 6, 2007. (AR
15  11). At step two, the ALJ found that Plaintiff had severe impairments
16  including: "affective mood disorder, [a] history of polysubstance abuse
17  and status post intracranial injury." (Id.).

18

19     At step three, the ALJ found that the severe impairments at step
20  two did not meet or medically equal a listed impairment. (Id.). The
21  ALJ found that Plaintiff suffered: mild restrictions in his activities
22  of daily living and maintaining concentration, persistence and pace;
23  moderate difficulties in social functioning; and no episodes of
24  decompensation of an extended duration. (Id.). Accordingly, Plaintiff
25  did not satisfy the "B Criteria" of listings for mental impairments.
26  (Id.).  The ALJ also found that the evidence failed to establish the
27  presence of "C Criteria" listings for mental impairments. (AR 12).

28

                                   24

At step four, the ALJ considered all Plaintiff's symptoms, "and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," to determine Plaintiff's RFC.   (Id.).   The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found Plaintiff's testimony lacked credibility with respect to his statements about the intensity, persistence and limiting effects of his impairments.  (AR 12-13).   The ALJ based his credibility finding on, and gave great weight to, Dr. Krieg's August 17, 2009 Psychological Evaluation wherein she noted Plaintiff did not appear to be putting forth his best effort, and that Plaintiff's test results were "very probable for malingering."  (AR 14, 380).

The ALJ found that Plaintiff has the residual functional capacity to perform "a full range of work at all exertional levels but with the following nonexertional limitations: working with things rather than people and 3-4 step work process."  (AR 12).

At step five, the ALJ found that Plaintiff is capable of performing past relevant work as a furniture mover.  (AR 14).  Accordingly, the ALJ found that Plaintiff is not disabled.  (Id.).

## VI.
### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error

1  or are not supported by substantial evidence in the record as a whole.

2  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v.

3  Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

4

5      "Substantial evidence is more than a scintilla, but less than a

6  preponderance." Reddick, 157 F.3d at 720.  It is "relevant evidence

7  which a reasonable person might accept as adequate to support a

8  conclusion." Id.  To determine whether substantial evidence supports

9  a finding, the court must "'consider the record as a whole, weighing

10 both evidence that supports and evidence that detracts from the

11 [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny

12 v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can

13 reasonably support either affirming or reversing that conclusion, the

14 court may not substitute its judgment for that of the Commissioner.

15 Reddick, 157 F.3d at 720-21.

16

17                              **VII.**

18                          **DISCUSSION**

19

20     Plaintiff contends the ALJ erred for a number of reasons.  First,

21 he claims that the ALJ failed to properly consider all of the relevant

22 medical evidence, particularly Plaintiff's treating records.

23 (Plaintiff's Memorandum ("Pl. Memo") at 2).  Second, Plaintiff argues

24 the ALJ's credibility finding regarding Plaintiff's testimony was

25 improper because he failed to consider Plaintiff's subjective complaints

26 and the "objective medical evidence" supporting Plaintiff's complaints.

27 (Id. at 6).  Finally, Plaintiff claims the ALJ failed to properly assess

28 third party lay witness statements.  (Id. at 6-7).  For the reasons

discussed below, the Court disagrees with Plaintiff's contentions and concludes that the ALJ's decision should be AFFIRMED.

**A.    The ALJ Properly Considered All Of The Relevant Medical Records**

Plaintiff contends that "the ALJ [] clearly failed to properly consider the relevant treating evidence of record including multiple psychiatric admits and [Global Assessment Functioning] [s]cores in the marginal or non-functional range, all indicative of severe mental symptoms and limitations." (Pl. Memo at 5).  Further, Plaintiff claims "the ALJ [did not] provide any explanation as to why he was completely disregarding all of the relevant treating evidence of record."  (Pl. Memo at 3).  Specifically, Plaintiff first asserts the ALJ failed to consider medical evidence indicating Plaintiff's admissions into "the hospital for psychiatric reasons on at least three separate occasions: December 29, 2007, February 13, 2009, and February 18, 2009." (Pl. Memo at 2).  Second, Plaintiff claims the ALJ failed to consider evidence that "Plaintiff's health care providers have listed [Plaintiff's] [GAF scores] ranging from 30-62 at various points in time between 2003 and 2009." (Pl. Memo at 2-3).  Finally, Plaintiff contends the ALJ failed to consider "a third party statement from Mr. Tyree Adair, a psychological technician with San Bernardino County Department of Behavioral Health dated February 22, 2008, which consistently and credibly describes significant psychological symptoms and limitations effecting [sic] this Plaintiff." (Pl. Memo at 3).  The Court disagrees with Plaintiff's contentions.

If the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  When the treating doctor's opinion is contradicted by the opinion of another doctor, the ALJ may reject the treating doctor's opinion only by providing "'specific and legitimate reasons' supported by substantial evidence in the record for so doing."  Lester, 81 F.3d at 830 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).  Furthermore, the ALJ is responsible for "resolving conflicts in medical testimony, and for resolving ambiguities," Andrew v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995), and his decision "must be upheld where the evidence is susceptible to more than one rational interpretation." Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

In his decision, the ALJ found that Plaintiff suffers from "affective mood disorder," a severe mental impairment.  (AR 11). Specifically, the ALJ based a finding of Plaintiff's impairment from examining sources that claimed Plaintiff has mild or moderate "paragraph B" criteria limitations.  (AR 11-12).  The ALJ noted:

> In activities of daily living, [Plaintiff] has mild restriction.  In social functioning, [Plaintiff] has moderate difficulties.  With regard to concentration, persistence or pace, [Plaintiff] has mild difficulties.  As for episodes of decompensation, [Plaintiff] has experienced no episodes of decompensation, which have been of extended duration.

(AR 11).  The ALJ explained that the limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment. However, the ALJ stated "[Plaintiff's] RFC assessment reflects the degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis."  (AR 12).

The ALJ concluded that based on Plaintiff's limitations, and "[a]fter careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: working with things rather than people and 3-4 step work process."  (AR 12).  The ALJ noted that "[i]n making this finding, the [ALJ] has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 416.929 and SSRs 96-4p and 96-7p."  (AR 12).

In determining Plaintiff's RFC, the ALJ specifically cited an evaluation from April 15, 2008, conducted by State Agency medical consultants.  The ALJ found relevant that State Agency consultants observed that Plaintiff "has extensive tattoos but appearance is generally within normal limits.  Facial expressions/postures suggest emotional tension/over-reactivity.  Intellectual function was grossly intact; however general fund of knowledge is impaired.  Gait is within normal range, Romberg (-) . . . ."  (AR 13, 274).  The ALJ reiterated that "State Agency medical consultants concluded there were no physical functional limitations."  (AR 13, 275).

The ALJ also incorporated in his RFC findings medical treating records from an examining physician, Dr. Opborek, and treating records from Arrowhead Regional Medical Center dated January 13, 2009 to March 3, 2009.  (AR 13).  The ALJ noted that:

> Per the records the [Plaintiff] was prescribed Inderol and was doing well overall on medication.  Per the records the [Plaintiff] had some difficulty reading.  On April 30, 2009 he was prescribed Depakote Celexa, Seroquil, Effexor, and Benadryl.  He was diagnosed with a Mood Disorder, Psychotic Disorder, NOS, and Personality Disorder, NOS, with antisocial traits.  [Plaintiff] reported being depressed and anxious. He denied being currently suicidal but sometimes has thoughts.  He reported being seen five times at Arrowhead Crisis Center Department of Behavioral Health and was last seen February 3, 2009 and said he was diagnosed with Bi-Polar Disorder, Mood Disorder, Depression, and Insomnia.  He denied any history of hallucinations or homicidal ideations.  He stopped smoking cigarettes two months ago and denied ever drinking alcohol or using drugs.  He denied a history of substance abuse or 12-step meeting attendance.  [Plaintiff's] typical daily activities include sleeping that he attributed to being depressed.  He is able to manage self-care without assistance or verbal prompting.  He stated not getting along with family and friends.

(AR 13).  The ALJ also relied on Dr. Krieg, a consultative examiner who found that "[Plaintiff] did not appear to be putting forth his best

effort," to conclude that Plaintiff's test results may not be valid. (AR 14). Thus, the ALJ considered some, not all of Plaintiff's treating records. The ALJ did not reject findings in the relevant treating records, but instead incorporated the observations contained in the treating records into his conclusion that Plaintiff has a severe mental impairment – affective mood disorder. (See AR 11-13).

Moreover, to the extent the ALJ did not expressly consider records identified in Plaintiff's Memorandum, Plaintiff does not demonstrate how those records change the analysis or outcome that Plaintiff is not disabled. The ALJ found severe mental limitations. (See AR 11-12). The records identified by Plaintiff are consistent with those limitations. Therefore, any error in failing to expressly acknowledge these records was harmless error as they would not have changed the outcome. See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) (if ALJ's error was inconsequential to the ultimate nondisability determination, no remand required); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

**B.** **The ALJ Properly Rejected Plaintiff's Credibility**

Plaintiff asserts that the ALJ erred in reaching his decision because he improperly discounted Plaintiff's subjective testimony. (Pl. Memo at 6). First, Plaintiff claims that the ALJ's credibility finding was improper because he failed to consider "objective medical evidence" supporting Plaintiff's subjective complaints of impairment. (Id.). Plaintiff states the ignored "objective medical evidence" includes

1  Plaintiff's testimony that he had been living in an assisted living
2  facility with other psychiatric patients for approximately a year and
3  a half, "Plaintiff's subjective written statements of record which
4  document consistent and credible subjective symptoms and limitations
5  throughout this process," and the fact that Plaintiff's claims regarding
6  his impairments and inability to work have been consistent throughout
7  the entire claims process.  (Id.).  Second, Plaintiff argues that "the
8  ALJ failed to specify which allegations of pain and/or symptoms he found
9  not credible," and that the ALJ failed to state clear and convincing
10 reasons for rejecting Plaintiff's testimony.  (Id. at 7).  The Court
11 finds these arguments are without merit.

12

13      The ALJ may reject a plaintiff's testimony if he or she makes an
14 explicit credibility finding that is "supported by a specific, cogent
15 reason for the disbelief."  Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th
16 Cir. 1990) (internal citations omitted).  If the ALJ's credibility
17 finding is supported by substantial evidence in the record, the Court
18 may not engage in second-guessing.  Thomas v. Barnhart, 278 F.3d, 947,
19 959 (9th Cir. 2002).  Evidence of malingering, by itself, is sufficient
20 reason to find a claimant not credible.  See Benton ex rel. Benton v.
21 Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  The ALJ's findings are
22 entitled to deference if they are supported by substantial evidence and
23 are "sufficiently specific to allow a reviewing court to conclude the
24 adjudicator rejected the claimant's testimony on permissible grounds and
25 did not arbitrarily discredit a claimant's testimony regarding
26 [subjective symptoms]."  Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th
27 Cir. 1991) (en banc).  Unless there is affirmative evidence showing that
28 the plaintiff is malingering, the ALJ's reasons for rejecting the

1  plaintiff's testimony must be "clear and convincing." <u>Lester</u>, 81 F.3d
2  at 834.  Inconsistency with medical evidence is one such reason.  <u>See</u>
3  <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005).

5  Here, the ALJ gave valid reasons for discounting Plaintiff's
6  allegations of subjectively disabling symptoms.  The ALJ explicitly
7  noted Dr. Krieg's opinion that Plaintiff was likely malingering.  (AR
8  13-14, 388-89).  Even Plaintiff's treating doctor, Dr. Opbroek, echoed
9  this finding in his February 6, 2009 Progress note stating that
10 Plaintiff was "malingering."  (AR 362).  Accordingly, substantial
11 evidence supports the ALJ's adverse credibility finding.  <u>See</u> <u>Benton</u>,
12 331 F.3d at 1040 (finding evidence of malingering, by itself, is
13 sufficient reason to find a claimant not credible).

15 Furthermore, Plaintiff's functional restrictions assessed by Dr.
16 Gregg, Dr. Woodard, and Dr. Krieg were all inconsistent with the extreme
17 limitations claimed by Plaintiff.  Plaintiff claimed his head trauma
18 resulted in problems with understanding, memory, balance, equilibrium,
19 dizziness, dry mouth, and headaches.  (AR 96).  He also claimed he
20 faints after twenty minutes of exertion, suffers from extreme paranoia,
21 hallucinations, suicidal ideations, depression and extreme outbursts of
22 anger.  (<u>Id.</u>).

24 In contrast, Dr. Gregg opined "[Plaintiff] is reasonably able to
25 learn, remember and sustain [s]imple, [r]outine [t]asks in a non-public
26 setting over the course of a normal, [forty-hour] work week." (AR 267).
27 Dr. Woodard also found that there did not "appear to be any limitations
28 in [Plaintiff's] physical activities on the bases of his current

neurologic status." (AR 272). Thus, Plaintiff's subjective symptom testimony is inconsistent with the medical evidence.

Dr. Krieg similarly stated that if Plaintiff was malingering:

> There would be no impairment that would interfere with his ability to complete a normal workday or workweek. He would be able to deal with the usual stress that may be encountered in competitive work and adjust to changes. He would no create a hazard in the workplace. He would be capable of performing simple, repetitive work tasks.

(AR 389). Because ample evidence supported a finding that Plaintiff was malingering, and because the ALJ's credibility finding is supported by substantial evidence in the record, the ALJ's credibility determination is entitled to deference. Thus, no remand is necessary.

## C.   **The ALJ's Failure To Expressly Consider The Third Party Statements Was Harmless Error Because Neither Statement Would Have Altered The Outcome**

Plaintiff contends that the ALJ committed reversible error because Plaintiff's subjective testimony was "bolstered by two third party statements also contained within the Administrative Record neither of which were even mentioned . . . ." (Pl. Memo at 7). Specifically, Plaintiff claims "[t]he ALJ [] completely failed to mention" lay witness statements made by Mr. Tyree Adair, a psychological technician, and Ms. Carmen Rodriguez, "a friend of Plaintiff's for over ten years," in his

34

unfavorable decision.    (Pl. Memo 7-8).    However, the ALJ properly considered and accounted for the statements of these lay witnesses in his decision.

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work.    <u>Stout v. Comm'r Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. July 25, 2006); <u>Smolen</u>, 80 F.3d at 1288; 20 C.F.R. §§ 404.1519(d)(4) & (e), and 416(d)(4) & (e).    The ALJ may discount the testimony of lay witnesses only if she gives "reasons that are germane to each witness." <u>Valentine v. Comm'r of Soc. Sec. Admin.</u>, 574 F.3d 685, 694 (9th Cir. 2009) (citing <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993)); <u>see also</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citations omitted)).

If an ALJ fails to expressly consider lay witness testimony, the Court must determine whether the ALJ's decision remains legally valid, despite such error.    <u>Carmickle</u>, 533 F.3d at 1162.    If the ALJ's ultimate credibility determination and reasoning are adequately supported by substantial evidence in the record, no remand is required.    <u>Id.</u> (citing <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195-97 (9th Cir. 2004)).    An ALJ may reject lay witness testimony if the witness's testimony is inconsistent with the medical evidence.    <u>Bayliss</u>, 427 F.3d at 1218.    Credible lay witness testimony that is consistent with the medical evidence may be competent evidence to show the severity of

1   Plaintiff's symptoms and how it affects a Plaintiff's ability to work.

2   See Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009).

3

4        Plaintiff asserts that the ALJ failed to consider the opinion of

5   Mr. Tyree Adair, a psychological technician at the Department of

6   Behavioral Health. (Pl. Memo at 3). In his February 22, 2008 Function

7   Report, Mr. Adair described Plaintiff's lack of social skills, inability

8   to follow directions, and Plaintiff's hallucinations. (AR 103-11). Mr.

9   Adair claims Plaintiff "struggles daily to learn how to socialize in

10  groups . . . has to be told more than once what was said . . . [and]

11  gets suicidal, depressed and feels hopeless." (AR 107-09). However,

12  Mr. Adair's lay opinion on the severity of Plaintiff's impairments is

13  contradicted by the opinions of Dr. Opbroek and Dr. Krieg. As noted

14  above, both doctors found evidence that Plaintiff was malingering. (AR

15  362, 389). See Bayliss, 427 F.3d at 1218 ("[i]nconsistency with the

16  medical evidence is one such reason" for discrediting the testimony of

17  a lay witness). Furthermore, alternative portions of Mr. Adair's

18  statement merely recounted what Plaintiff had told him while completing

19  the Function Report. (AR 103-11). Thus, express consideration of Mr.

20  Adair's statement would not have altered the ALJ's decision. Even if

21  it was error not to expressly consider the statement, the error was

22  harmless. The ALJ's decision remains legally valid, despite such error.

23  Carmickle, 533 F.3d at 1162.

24

25       Further, to the extent the ALJ erred by disregarding the third

26  party statement of Ms. Rodriguez, any error was harmless. Ms. Rodriguez

27  stated:

28

36

1       [She has] been helping Mr. Olivas for sometimes [sic].  He

2       needs reminding on just about all of his important daily

3       activities such as medications and keeping appointments. [She

4       has] witnessed on several occasions outbursts with violent

5       espsidoes [sic] that comes [sic] from his frustration.

6       Becomes argumentative and verbally out of control.  Needs

7       medication daily which seems to keep him stable.

8

9 (AR 127).  Ms. Rodriguez claimed Plaintiff is "moody, [it is] hard [for

10 him] to concentrate, [Plaintiff experiences] drowsniess [sic], [and] is

11 not able to really socialize with others."  (AR 125).   Because Ms.

12 Rodriguez's statement is substantively identical to Plaintiff's

13 testimony, her testimony would not have altered the ALJ's decision.

14 Accordingly, even if the ALJ committed error in disregarding her

15 statement, the error was harmless.   No remand is required, as the ALJ's

16 decision remains legally valid.  Carmickle, 533 F.3d at 1162.

17 \\

18 \\

19 \\

20 \\

21 \\

22 \\

23 \\

24 \\

25 \\

26 \\

27 \\

28 \\

**VIII.**

**CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[4] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 7, 2011

                                    _____/S/_____
                                    SUZANNE H. SEGAL
                                    UNITED STATES MAGISTRATE JUDGE

**THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION NOR IS INTENDED TO BE INCLUDED IN OR SUBMITTED TO ANY ONLINE SERVICE SUCH AS WESTLAW OR LEXIS.**

---

[4]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."